920 F.2d 673
 Clark Davenport SNELL; Sharon Ruth Snell, individuals,
husband and wife; Jim R. Snell, an individual; Beth Snell,
a minor child by her next friends and parents Clark and
Sharon Snell; Jason Snell, a minor child by his next
friends and parents Clark and Sharon Snell; Brittany Snell,
a minor child by her next friends and parents Clark and
Sharon Snell; Patricia Jean Turtle, by her next friends and
legal guardians Clark and Sharon Snell; and Jesse Sanders,
by his next friends and legal guardians Clark and Sharon
Snell, Plaintiffs-Appellees,
v.
Conley TUNNELL; Lissa Vernon; Mary Asbury; the Honorable
Sidney D. Brown; and State of Oklahoma ex rel.
the Department of Human Services, Defendants,
and
Michael Sweptson; Barbara Sieck; Benita Levingston; and
Pamela Padley, Defendants-Appellants.
 No. 88-2879.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 30, 1990.
 
 David A. Brown, Asst. Gen. Counsel (Charles Lee Waters, Gen. Counsel, Roger Stuart and Richard L. Freeman, Jr., Asst. Gen. Counsel, with him on the brief), Legal Div., Dept. of Human Services, Oklahoma City, Okl., for defendants-appellants.
 Marjorie Ramana (Allan DeVore with her on the brief), The DeVore Law Firm, Oklahoma City, Okl., for plaintiffs-appellees.
 Before SEYMOUR and BALDOCK, Circuit Judges and SAFFELS, District Judge.*
 BALDOCK, Circuit Judge.
 
 
 1
 We should be careful to get out of an experience only the wisdom that is in it--and stop there; lest we be like the cat that sits down on a hot stove-lid. She will never sit down on a hot stove-lid again--and that is well; but she will never sit down on a cold one any more.
 
 
 2
 Pudd'nhead Wilson's New Calendar.
 
 
 3
 M. Twain, Following the Equator ch XI at 107 (Harper Bros. ed.).
 
 
 4
 Plaintiffs instituted this action seeking injunctive relief and damages under 42 U.S.C. Secs. 1983 & 1985 based upon an investigation by the Oklahoma Department of Human Services (DHS) concerning allegations of child abuse. The district court denied injunctive relief, the Sec. 1985 claim was dismissed, and only four defendants remain after district court proceedings. In this appeal, we are required to decide whether these remaining defendants, DHS employees, are entitled to absolute or qualified immunity for activities which occurred during an investigation of a shelter/home for children operated by plaintiffs-appellees, Clark and Sharon Snell.
 
 
 5
 Defendants-appellants, Michael Sweptson (County Supervisor; Oklahoma County Child Welfare Field Services, Division of Children and Youth Services (DCYS)), Barbara Sieck (Social Services Supervisor; Oklahoma County Child Welfare Unit), Benita Levingston (Social Worker; Oklahoma County Child Welfare Unit), and Pam Padley (Assistant General Counsel; DHS) appeal from the district court's denial of absolute and qualified immunity. We review the denial of immunity de novo as a final decision under 28 U.S.C. Sec. 1291. Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817-18, 86 L.Ed.2d 411 (1985); McEvoy v. Shoemaker, 882 F.2d 463, 465 (10th Cir.1989).
 
 
 6
 Given the facts, we agree with the district court that the three non-attorney defendants challenging the denial of absolute immunity (Sweptson, Sieck and Levingston) were acting in an investigative, rather than a prosecutorial capacity, and accordingly, we affirm the denial of absolute immunity for these defendants. On narrower grounds, we affirm the district court's decision that the defendant DHS attorney (Padley) is not entitled to absolute immunity. We determine that defendant Padley, though acting in a prosecutorial capacity, did so without authority when she applied to the district court for assistance with the investigation of the Snells. As to the defense of qualified immunity, we agree with the district court that obtaining a court order, used to gain entry into the Snell home, based upon information known to be false clearly violates the fourth amendment, and a reasonable public official would have known this. Thus, we affirm the denial of qualified immunity for such conduct.
 
 I.
 
 7
 At the outset, we note that our review of the district court's order is limited to deciding whether absolute or qualified immunity was properly denied to these four remaining defendants given the trial court's decision that the plaintiffs could proceed to trial. Snell v. Tunnell, 698 F.Supp. 1542 (W.D.Okla.1988). Although the district court resolved other issues in its lengthy opinion, we do not pass on the merits of the issues which encompass the grant of summary judgment in favor of other defendants,[1] including Mary Asbury (District Supervisor; Child Welfare Field Services, DCYS) and Conley Tunnell (Assistant Director; DHS; DCYS). We also do not pass on claims involving the grant of qualified immunity to the defendants.
 
 
 8
 In their brief, the Snells have challenged the district court's grant of qualified immunity to the defendants on the Snells' due process (liberty) and privacy claims. Brief of Plaintiffs-Appellees at 37-39. We have recognized the doctrine of pendent appellate jurisdiction to decide otherwise non-appealable issues, see State of Colo. v. Idarado Mining Co., 916 F.2d 1486, 1491-92 (10th Cir.1990); Tri-State Generation & Transmission v. Shoshone River Power, 874 F.2d 1346, 1351-53 (10th Cir.1989), and have applied the doctrine in cases involving claims of immunity to determine that a plaintiff's substantive claims were barred, see Petrini v. Howard, 918 F.2d 1482, 1483 (10th Cir.1990); Hill v. Department of the Air Force, 884 F.2d 1318, 1320 (10th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); see also Dube v. State Univ., 900 F.2d 587, 598-600 (2d Cir.1990); 15 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure Sec. 3914.20 (1990 Supp.). However, even assuming that our jurisdiction could extend to a plaintiff's cross-appeal from a defendant's interlocutory appeal of a denial of immunity, see Barrett v. United States, 798 F.2d 565, 571 (2d Cir.1986) (cross appeal of grant of immunity permitted where issues same as direct appeal of denial of immunity to other defendants), the plaintiffs in this case have not filed a cross-appeal. In all of the above cases, the court of appeals considered an exercise of jurisdiction to consider otherwise non-appealable issues raised by an appellant or cross-appellant. Thus, in Idarado, Tri-State, Petrini, Hill, Dube and Barrett, the only pendent issues considered were those raised by an appealing party. In no case did a court reach out to decide an issue when the party adversely affected had not appealed the adverse order. Accordingly, we simply do not have jurisdiction over the due process and privacy issues. Appellate resolution of those issues must await another day.
 
 A.
 
 9
 Plaintiffs Clark and Sharon Snell use their private home as a foster care environment for children whose natural parents are unable to care for them.[2] The Snells' natural and adopted children, as well as children the Snells care for under various guardianship and custody arrangements, reside in the home. On August 26, 1987, defendant Padley applied to the juvenile division of the state district court seeking the court's assistance with a DHS investigation, after the district attorney, who normally would file such an application, refused repeatedly to become involved. The supporting grounds of the application provided in part:
 
 
 10
 1. DHS has received allegations of neglect, lack of supervision, child prostitution and child pornography in the Snell's home in violation of 21 O.S. Secs. 843-48.
 
 
 11
 2. DHS has received allegations that the Snells are effectively operating an unlicensed emergency shelter, child care facility, or foster home in violation of the Oklahoma Child Care Facilities Licensing Act, 10 O.S. Sec. 401 et seq.
 
 
 12
 3. DHS has been unable to complete the child abuse investigation due to lack of cooperation by the Snells.
 
 
 13
 4. Due to the child abuse allegations and reports received of numerous children being placed into and out of the Snell's home, DHS is concerned regarding the health, safety and welfare of the children residing with the Snells. The number and identity of the children residing with the Snells is unknown.
 
 
 14
 In re Child Abuse and Licensing Investigations of the Clark and Sharon Snell Home by the Oklahoma Dep't of Human Serv., Application at 1 (Okla. County Dist. Ct. Aug. 26, 1987), reproduced in rec. vol. I, doc. 1, ex. A. Primarily on the strength of the allegations of pornography, prostitution and denial of access to the children, the state district judge issued an ex parte order authorizing DHS personnel, accompanied by the police, to enter the Snell residence and investigate these allegations. In re Child Abuse and Licensing Investigations of the Clark and Sharon Snell Home by the Oklahoma Dep't of Human Serv., Ex Parte Order at 1 (Okla.County Dist.Ct. Aug. 26, 1987), reproduced in rec. vol. III, doc. 114, ex. A. The ex parte order directed that the children in the Snell home be placed in protective custody if the Snells could not produce a valid custody order for each child or if the welfare of the children was endangered. Id. at 1-2. Because the Snells could not produce documents evidencing court-ordered custody, seven children were removed from the home and placed in a juvenile shelter. At a subsequent hearing, the police detective involved in the case testified that the only allegations of child pornography came from defendants Asbury, Levingston and Sweptson. Rec. vol. III, doc. 114, ex. O at 68; see also id., ex. W at 18-19 (tracing pornography and prostitution allegations to defendant Levingston). Although two complaints about the lack of supervision and order at the Snell residence had occurred, Snell, 698 F.Supp. at 1549, the child prostitution and pornography allegations were groundless, assuming arguendo that such allegations were ever received.
 
 B.
 
 15
 The Snells and certain DHS employees have experienced less than an amicable relationship. A variety of alleged complaints against the Snells, ranging from improper supervision to failure to return children, have been processed by DHS over the years. The Snells have complained in turn about various DHS employees and custody decisions made by DHS.
 
 
 16
 In 1986, the Snells complained to DHS on two occasions concerning DHS social workers. First, the Snells complained about a DHS worker's "inappropriate visit" to their home and questioning of Mrs. Snell. Rec. vol. III, doc. 114, ex. P at 3. Second, they disagreed with a DHS determination that a child who had been placed in the Snell home for over one year should be returned to the natural mother. Id. at 4. The Snells were uncertain that the mother was capable of taking care of the child and complained that a DHS worker had inaccurately reported information furnished by them. Id. In February 1987, they complained to the DHS, the governor's, the attorney general's and the district attorney's offices about a DHS worker handling a case in another county. Id. The Snells believed that the case was mishandled and the father involved was using AFDC payments to pay restitution rather than feed his children. Id. According to the Snells, the children were neglected, lacked adequate food and may have been subject to physical abuse. Id. Allegedly, DHS revealed Sharon Snell's name to the father and the father threatened her. Id.
 
 
 17
 The Snells have had frequent visits from DHS personnel since they adopted their first child in 1981. Id. at 1. They list nine different DHS workers who have visited the home and state: "We have never denied agents of the Oklahoma Department of Human Services access to our home." Id. at 1-2. In April 1987, two DHS Licensing Division employees (Prins Anderson and Judy Collins) made an on-site visit to resolve various complaints about the Snells and to determine whether they were in compliance with state licensing laws. The DHS employees determined that "the Snells are not in violation of the Child Care Facilities Licensing Act." Rec. vol. III, doc. 114, ex. S at 2.
 
 
 18
 DHS social worker David McClain investigated the Snell home in July 1987, based upon an anonymous complaint of neglect and inadequate supervision. See rec. vol. II, doc. 115, ex. U. Plaintiffs' evidence indicates that the report generated by this visit did not indicate a problem with care:
 
 
 19
 The interior of the home was remarkably clean and organized with this many children about the house. The worker counted 11 children in the house. The children were clean; appeared to be in good physical health and appropriately clothed. There was evidence of daily housekeeping activity. The older children were assigned age appropriate chores to be done on a daily basis. The children gave the appearance of being well fed and happy to be a part of this household.
 
 
 20
 Rec. vol. II, doc. 115, ex. V (Form CWS 14-A). The Snells would not identify the children in their care and McClain raised several questions about this in his report.[3] While McClain was present, the Snells were in telephonic contact with their counsel. The Snells maintain that McClain indicated such disclosure was voluntary. Rec. vol. III, doc. 114, ex. P at 5, p 6. They told McClain that the children in the home were adopted or were wards pursuant to legal guardianship or were there by parental consent. Id. McClain's report, also signed by defendant Sweptson, indicates that the investigative findings were uncertain and that a copy of the report would be provided for information only to the district attorney for Oklahoma County Juvenile Court. Rec. vol. II, doc. 115, ex. V. The report's recommendation to the district attorney for the Oklahoma County Criminal Court was that additional investigation concerning possible criminal prosecution of "non-accidental physical or mental injury, sexual abuse or neglect appears indicated." Id. This recommendation is paradoxical given that the report makes no mention of such allegations.[4]
 
 
 21
 The Snells maintain that during his investigation, McClain made derogatory comments concerning them to neighbors and told one that the Snells had been "run out of Bethany." See rec. vol. I, doc. 63 at 9; id. vol. III, doc. 114, ex. D at 42. This prompted a July 20, 1987 meeting between Clark Snell and DHS officials in which Snell aired his complaints about DHS. These complaints were referred to Lissa Vernon, the supervisor of Child Welfare Field Services, DCYS, who in turn referred them to Mary Asbury, the district supervisor in Child Welfare Field Services. Rec. supp. vol. II, doc. 150, ex. A at 24-25.
 
 
 22
 Vernon also referred a complaint about the Snells to Asbury. In a memo dated July 23, 1987, Asbury discussed various allegations against the Snells: 1) they misled unnamed parents into granting them custody of children as an alternative to child welfare services (CWS), 2) they frequently complained about DHS personnel, 3) the Snells' reporting of abuse and neglect to CWS "was more like harassment as the Snells called demanding an investigation be done immediately, several times in a short period of time," 4) various neighbors complained about the number of children in the Snell home and the quality of care, 5) Mr. Snell was "vague" about the source of his financial assistance to operate his home, 6) although Mr. Snell claimed that his principal source of income was from an appliance repair business, a business listing appeared only in the white pages of the telephone directory without an address, 7) the assessor's office did not list Mr. Snell as an owner of his home, which was valued at approximately $150,000, and 8) after a complimentary article about the Snells ran in the newspaper, CWS received a call from the Warr Acres police alleging that they were known drug dealers. Rec. vol. II, doc. 115, ex. I1. The tenor of Asbury's report is best described in its concluding paragraph:
 
 
 23
 In conclusion, we have a couple who on the surface appear to be wonderful philanthropic people who only want to care for children with no bureaucratic red tape. However, legitimate questions can also be raised regarding their ability to care for this number of children; the actual facts regarding these children coming into their care; the quality of the care and the source of funding.
 
 
 24
 Id. DHS continued its investigation, concentrating on complaints about the Snells, rather than complaints by the Snells about DHS.
 
 C.
 
 25
 DHS received three adverse reports concerning the Snells in late-July and early-August 1987. A neighbor complained that children from the Snell home lacked adequate supervision when playing. Id. ex. Z at 1. An in-law of Mrs. Snell's son complained that the Snell house was dirty and the children were neglected. Id. at 2-3 and Fails depo. at 40. A retarded eleven-year old boy, G.H., whose mother could no longer cope with his severe emotional disorders, was the source of another complaint. G.H. alleged that during a temporary stay at the Snell home, Mr. Snell struck and kicked him and told him he could either go to jail, stay with the Snells, or be killed. Rec. vol. II, ex. B1 (CWS 14-A report). Mr. Snell and his housekeeper indicated that G.H.'s mental problems, including sexual and physical aggressiveness, and physical problems, including encopresis, were beyond what the Snells could handle given their responsibilities to the other children in the home.
 
 
 26
 Asbury assigned the investigation of these complaints to defendant Sieck, rec. vol. I, doc. 93, ex. 1 at 2, who in turn assigned the investigation to defendant Levingston, id. ex. 6 at 1. However, action on investigating these complaints was deferred, contrary to DHS policy concerning these types of allegations. See DHS Child Welfare Services-Child Abuse/Preventive Services Procedures Sec. 622.4 (10/1/84), reproduced in rec. vol. III, doc. 114, ex. I. Two days later, on August 12, 1987, a DHS meeting was held between Asbury, Vernon, defendant Padley and licensing division employees Collins and Anderson to discuss a variety of topics concerning the Snells, including: 1) the large number of children in and out of the home, 2) claims by Jesus House[5] clients that the Snells threatened to call DHS if the parents did not release their children, 3) Clark Snell's criminal conviction and subsequent incarceration (1974-75) and his failure to disclose this in adoptive home studies, 4) Clark Snell's income and the likelihood that it could be derived from his appliance repair business given that the business was listed only in the white pages of the telephone directory, 5) Asbury's incorrect belief that DARE (Drug Addict Recovery Enterprises, Inc.) did not exist and therefore could not be providing support to the Snells, 6) whether the Snells could be named guardians based upon a signed and notarized parental statement, and 7) Clark Snell's refusal to identify the children in his care when asked by social worker McClain. Rec. supp. vol. II, doc. 150, ex. D at 201-24. A decision was made to refer these matters to the police for investigation and to contact assistant district attorney Rebecca McNeese for her assistance. Id. at 223-24.
 
 
 27
 At the request of defendant Levingston, detective J.M. Einhorn met with defendants Sweptson and Asbury on August 14, 1987. Rec. supp. vol. II, doc. 150, ex. G at 49-50. The defendants expressed concern that: 1) a large number of children and adults were entering and leaving the house at all hours, 2) the Snell home was not licensed,[6] 3) the Snells had refused to disclose the identity of all the children to DHS and 4) Clark Snell had not disclosed his criminal record to DHS. Id. at 51-57. The lower court viewed this meeting as "the genesis of the pornography and prostitution suspicions." Snell, 698 F.Supp. at 1550.
 
 
 28
 Detective Einhorn's testimony concerning the source of the pornography and prostitution allegations is inconsistent. At the hearing held the day after the seven children were removed from the Snell home, he testified that these allegations were first made by DHS, specifically Asbury, Sieck and Sweptson, rec. vol. III, doc. 114, ex. O at 68; at a later deposition, he testified that the allegations were generated during a discussion between Sweptson, Asbury and himself. Rec. supp. vol. II, doc. 150, ex. G at 106-07. He could not say who initiated the allegations. Id. Einhorn indicated also that suspicion concerning child prostitution and pornography arose once he and DHS were informed that Clark Snell was sought for questioning by FBI special agent Leslie Treece. Id. at 53.
 
 
 29
 Agent Treece sought Clark Snell merely to comply with a request for information from another FBI district concerning a child prostitution investigation. The FBI was investigating a person suspected of using his children for child prostitution, and this person had stayed at Jesus House for a short time. The FBI merely wanted to ask Clark Snell some questions about the suspect. As DHS was well aware, Clark Snell never was a subject of that investigation.
 
 
 30
 According to agent Treece, some time prior to August 26, 1987, detective Einhorn asked her to contact defendant Levingston based upon "complaints regarding possible child pornography or prostitution, or something unusual going on at the Snells' house." Rec. vol. III, doc. 114, ex. W at 16. Agent Treece met with Asbury and defendant Levingston. Rec. vol. I, doc. 160, ex. 7 at 242-44. Asbury understood that agent Treece was seeking to interview Clark Snell in connection with a man from out-of-state who had passed through Jesus House, but that Clark Snell was not the subject of inquiry. Id. at 244.
 
 
 31
 Agent Treece indicated that this was the first time she had heard about allegations concerning child pornography or prostitution in relation to the Snells. She spoke to defendant Levingston who indeed made such allegations in the context of discussing complaints received by DHS against the Snells. Rec. vol. III, doc. 114, ex. W at 17-19. When the order authorizing police intervention into the investigation finally was obtained from Judge Brown, defendant Levingston invited agent Treece to be present when the order was enforced. Id. at 24-25. However, Treece declined as there was no evidence of any violation of federal law. Id.
 
 D.
 
 32
 Rebecca McNeese, assistant district attorney and the team leader of the juvenile division at the district attorney's office, was familiar with the DHS investigation of the Snells because DHS repeatedly sought to involve the juvenile division. McNeese indicated that her division viewed seizure of children from a caretaker as appropriate only when there is a showing of imminent or actual harm to the child. Rec. vol. II, ex. J at 7-11, 14. Normally, DHS would first contact police so the police could determine whether a child needed to be placed in custody. Id. at 11-12. If the DHS worker decided to pursue a court order through the juvenile division, the DHS worker would complete a report of the investigation (Form CWS-14A) and forward it to the juvenile division for review. Id. at 11. McNeese indicated that for strong policy reasons the division would not seek a pick-up order based upon a representation of a DHS worker that parents or guardians were uncooperative without some evidence of abuse or neglect. Id. at 15. On August 18 or 19, 1987, McNeese was approached by defendant Padley for a "favor" regarding the Snells. Id. at 29. McNeese cut the conversation off abruptly and did not learn what favor was sought. Id.
 
 
 33
 Plaintiffs' evidence in this case tends to show that the DHS searched for a statute upon which to base their investigation of the Snells. Thus, DHS expressed concern with whether the Snells had guardianship of more than five unrelated children, see Okla.Stat.Ann. tit. 58, Sec. 773 (West 1965) (renumbered as tit. 30, Sec. 4-101 (1990 Supp.)).[7] For reasons hardly clear, Asbury and defendant Levingston also were concerned with the words "upon conviction" as used in Okla.Stat.Ann. tit. 10, Sec. 410 (West 1987),[8] insofar as those words might apply to the Snells. See rec. supp. vol. II, ex. K at 110.
 
 
 34
 About a week before Judge Brown entered the order authorizing investigation and conditional temporary custody, defendant Sweptson arranged a meeting with Clark Snell. Snell states that he was told to come without counsel, and that Sweptson was concerned about leaks to the press. Rec. vol. III, doc. 114, ex. E1 at 13. Sweptson then discussed the allegations of abuse made by G.H. against the Snells. Id. at 12-14. According to Snell, Sweptson told him, " 'You know, anything could happen with that.' " Id. at 14. Snell then said: " 'You know we haven't done anything wrong. And why can't we have these other people at the meeting at the State Office like we did before.' " Id. To which Sweptson allegedly replied: " 'You don't have to do anything wrong out here. All we have to do is shuffle some papers around, and we can make anything fit.' " Id.
 
 E.
 
 35
 The events of August 19, 1987 as portrayed by plaintiffs' evidence represent the first attempt to enter and remove the children from the Snell home so as to proceed with the investigation. Upon the instructions of Asbury, defendant Levingston went to the police station and talked with Captain Griffith about the guardianship statute, supra note 7, and the allegations against the Snells. Rec. supp. vol. II, doc. 150, ex. K at 53, 56-57. Defendant Levingston voiced her belief that the statute in view of the allegations justified police assistance with the investigation in the form of picking up the children. Id. at 58. Captain Griffith wanted to see the statute before intervening; later that day, Hilde Lillegaard of the DHS licensing division and defendants Sieck and Levingston returned to the police station with a copy of the statute, but the sergeant on duty told them that he would need a court order before he could pick up the children. Id. at 54-55, 59. Defendant Sieck then informed Asbury of this turn of events. Rec. vol. I, doc. 160, ex. 7 at 264. About 6:30-7:30 p.m., defendant Sieck telephoned Asbury requesting the telephone number of Judge Brown. Id. at 264-65. Asbury and defendant Sieck were unable to reach Judge Brown; however, Asbury did reach Judge Wilson of the juvenile division. Id. at 265. Judge Wilson wanted to speak to them in person before intervening. Id.
 
 
 36
 Lillegaard and defendants Sieck and Levingston apparently made a field visit to the Snell neighborhood on the evening of August 19. From the home of one of the Snells' neighbors, defendant Sieck then called Judge Brown and advised him that the Snells might be moving. Rec. supp. vol. II, doc. 150, ex. K at 77. She told Judge Brown of the allegations against the Snells, of the suspected violation of the guardianship statute and that the police sergeant on duty would not pick up the children without a court order. Id. at 79. Judge Brown advised that he would issue an order if she thought it was an emergency, but that he would need the number of the police station. Id. at 80-81. Although defendant Sieck viewed the situation as constituting an emergency, defendant Levingston told the judge that they would get back to him with the number of the police station if they decided in favor of a removal order. Lillegaard and defendants Sieck and Levingston then called defendant Padley to update her on the evening's events; Padley indicated that she did not agree that a violation of the guardianship statute warranted removal of the children. Id. at 84-85.
 
 
 37
 Apparently, assistant district attorney McNeese later was contacted by Judge Brown concerning this DHS attempt of August 19 to obtain a removal order; she indicated to the judge that DHS simply had no evidence of abuse or neglect.[9] Rec. vol. II, ex. J at 26. McNeese understood that the judge was willing to consult with the police, but not authorize a removal order. Id.
 
 
 38
 The next day, August 20, 1987, assistant district attorney Steve Sullins was approached by defendant Sieck for a pick-up order based upon the Snells' alleged violation of the guardianship statute. Id. at 28. Sullins communicated this to McNeese, who wrote a memo to the DHS court liaison, Kathy O'Malley, expressing her displeasure with the DHS attempt to "shop" for a DA who would cooperate in obtaining a removal order given DHS' lack of written evidence. Id. at 27-28.
 
 F.
 
 39
 Around August 24, 1987, Asbury gave defendant Levingston a copy of a statute contained in the Child Care Facilities Licensing Act, supra note 8, which used the words "upon conviction." Rec. supp. vol. II, doc. 150, ex. K at 107. Defendant Levingston then sought an interpretation of the statute's applicability to the Snells from several sources including another assistant district attorney, Mary (Mimi) Smith. Id. at 107-08. When the DHS court liaison learned that the Levingston's inquiry involved the Snells, the liaison indicated that the inquiry should not be made because of McNeese's directive. Id. at 108-09. Defendant Levingston, with the approval of defendants Sweptson and Sieck, then approached Judge Brown for an interpretation of the statute and ostensibly learned that the "upon conviction" language "did mean that it was a misdemeanor and that the parents could be arrested." Id. at 114.
 
 
 40
 To defendant Levingston, this meant that the Snells could be arrested, but on August 26, 1987 she asked detective Einhorn to call the judge and confirm her understanding of the judge's interpretation. Id. at 116-17, 118-119. Between 9:00 and 9:30 a.m., defendant Levingston learned from Einhorn that Judge Brown was inclined to issue a pick-up order. Id. at 118. Detective Einhorn called Padley indicating that Einhorn had talked with Judge Brown. Rec. vol. III, doc. 114, ex. C at 157. The judge initially had indicated that the order would be issued to the police, but now, at least according to Einhorn, the judge wanted an application from DHS, rather than the district attorney. Id. Einhorn wanted defendant Padley to file an application which would provide the basis for entry of such an order. Id. Defendant Padley testified on deposition that she was reluctant to do so without checking with the district attorney first. Id. at 158. She instructed Einhorn to check with the district attorney; Einhorn checked and reported that the assistant district attorney considered the Snells "a DHS problem and the DA's office is not going to get involved." Id. at 159. Defendant Padley felt that Einhorn "was attempting to put some pressure on me to take an action." Id. at 158.
 
 
 41
 According to defendant Padley, she then recounted to Einhorn her understanding of the Snell situation to date:
 
 
 42
 I told him that I knew we had pending child abuse allegations in the Snell household, both neglect and abuse, and that I knew the FBI has contacted us in reference to the Snells and had indicated they wanted to contact Mr. Snell in connection with an investigation they were doing in child prostitution and pornography, but that there were no allegations that the Snells were involved in child prostitution, pornography, trafficking of children.
 
 
 43
 I then asked him if he knew of anything I didn't know....
 
 
 44
 He [Einhorn] indicated yes, there was, that he had information that led him to believe and that he was investigating an allegation of child prostitution and pornography as to the Snell home....
 
 
 45
 He [Einhorn] indicated to me that he had been in touch with an out-of-state police department, and that there was some connection between a person that this out-of-state police department was investigating in connection with child prostitution, pornography, trafficking in children, and the Snells, and that this person was traveling back and forth between the states into the Snell household.
 
 
 46
 Id. at 160-163. According to defendant Padley, Einhorn "said that he had allegations that the Snells were involved in child prostitution, pornography and trafficking children." Id. at 164. Defendant Padley would later learn that there were no such allegations.
 
 
 47
 Defendant Padley may not have been the only one who was led by Einhorn to believe that there was more information concerning the Snells and child prostitution and pornography; Judge Brown "was really taken aback" by the limited nature of Einhorn's testimony after the children were picked up, given Einhorn's earlier representations which led to the issuance of the removal order. Rec. vol. III, doc. 114, ex. D1 at 44; see also id. at 46.[10]
 
 G.
 
 48
 The day of August 26, Judge Brown contacted defendant Padley, and she returned his call to find that he was on the bench, but that he wanted to set up an appointment. Rec. vol. III, doc. 114, ex. C at 159, 165. At some point during the day, defendant Padley contacted Judy Collins in the DHS licensing division. Rec. vol. III, doc. 114, ex. C at 187. According to Collins, defendant Padley discussed the idea of "getting an order to force the Snells to cooperate as it relates to licensing and looking at papers and things like that," and asked her opinion. Rec. vol. III, doc. 114, ex. N at 47. Collins expressed her view that if it was solely a licensing issue, another field visit to the Snells was in order to request documentation on the children. Id. at 49-50.
 
 
 49
 Later in the day, defendant Padley spoke with Judge Brown. He wanted her to file an application so that the court could assist in the investigation and protect the children. Id., ex. C at 169. Judge Brown relied upon defendant Padley to coordinate the factual information in the case. Id., ex. D1 at 41-42. She told Judge Brown that she would get back to him. Id., ex. C at 169. Defendant Padley then attempted to contact DHS personnel including Charles Waters, Conley Tunnell, Lissa Vernon, Prins Anderson and Mary Asbury, but was unable to reach them. Rec. vol. I, doc. 96, ex. 3 at 184. Tunnell, Vernon and Asbury have stated affirmatively that they were not involved in the events of August 26. Id. ex. 1 at 7, ex. 9 at 2, ex. 10 at 2-3. Defendant Padley did talk with defendants Sweptson, Levingston and Sieck and someone in the licensing division before preparing the application and walking it over to the judge's office. Rec. vol. III, doc. 114, ex. C at 187. The judge looked at the application and began dictating his order. Id. at 188.
 
 
 50
 Defendant Padley delivered the application and order to defendant Levingston, who reviewed the order along with defendants Sieck, Padley and perhaps defendant Sweptson. Rec. vol. I, doc. 96, ex. 6 at 2. Lillegaard and defendants Sieck and Levingston took the order to the police station and presented it to Sergeant George Johnson for enforcement. Id. at 3. On August 26 at about 5:30 or 6:00 p.m., Lillegaard and defendants Sieck and Levingston accompanied the police to the Snell residence and seven children were removed based upon lack of custody documents. Id. at 3. The housekeeper reported to Mrs. Snell that the group led by the DHS social workers just barged in without knocking or ringing the doorbell and proceeded to gather the children. Rec. vol. III, doc. 114, ex. D at 50-51. In gathering the children, Sergeant Johnson "observed that the house was generally clean and neat" and he "saw no obvious indications of child abuse or neglect." Id. ex. E at 2. Defendants Sieck and Levingston actively assisted in the police investigation in the home.
 
 
 51
 Plaintiff Sharon Snell (Mrs. Snell) arrived at home about thirty minutes after the police and DHS social workers arrived. Id. ex. D at 3. She was presented with a document which included allegations that the children were unsupervised while riding bicycles and were left at the neighbors for extended periods. Id. at 14-15. According to Mrs. Snell, defendant Levingston attempted to talk to her, but Mrs. Snell went into her bedroom and attempted to phone her husband at work and Sister Ruth at Jesus House. Unable to reach them, Mrs. Snell finally reached Eloise Harris, a DHS social worker. Id. at 11-13. Again, according to Mrs. Snell, defendant Levingston grabbed the telephone, slammed it down and said: " 'If you don't let me--If you don't talk to me, I will get the police in here and they will make you talk to me.' " Id. The social workers then insisted on seeing the paperwork on the children "and if I did not cooperate, ... the police would force me to cooperate. That's what they were there for." Id. at 15.
 
 
 52
 Mrs. Snell then went from the bedroom to a desk in the living room which had the files on the children. According to Mrs. Snell, upon seeing the first court order on one of the children, defendant Sieck said: " 'That is not a legal document because it was rubber stamped [by the Oklahoma County District Court Clerk].' " Id. at 16. In the presence of defendant Levingston, defendant Sieck then directed the police: "To load up these kids, this lady does not have any legal documents on these kids." Id. Mrs. Snell then returned to her bedroom and gave the housekeeper permission to show the records to the social workers and police. Id. at 18. During this time, Mrs. Snell tried to call Hilde Lillegaard at DHS, not realizing that Lillegaard was present and making repeated apologies. Id. at 18, 34. Over an hour later, after the police and social workers had gone through all of the Snells' files, the police had a list of seven names for which no court custody documents had been found. Id. at 23; id. ex. E at 4. Sergeant Johnson asked defendants Sieck and Levingston if the seven children could be left with the Snells overnight because the Snells were likely to get the matter taken care of the next day. Id. ex. C at 24; id. ex. D at 4. Defendant Sieck responded: " 'They could run with the kids. It's happened before.' " Id. ex. C at 25. According to the sergeant, he was told by DHS workers that the court's order directed removal of the children in the absence of valid court orders concerning custody and that the circumstances in the home would not allow for interviews with the children. Id. ex. D at 4. Accordingly, Sergeant Johnson decided to take the children into custody.
 
 
 53
 All during this time, the children had been placed in groups. Id. Defendant Levingston inquired about Patricia Turtle, a child with medical problems. According to Mrs. Snell, defendant Levingston then told a nearby police officer that, " 'no Indian tribe would ever leave a child in this home.' " After the decision had been made to take the children, Mrs. Snell asked defendants Sieck and Levingston if two of the seven children could remain because efforts were being made to contact their natural mother. Id. ex. C at 30. This request was denied by both defendants with the comment that the natural mother could see her children at the shelter. Id.
 
 
 54
 As the DHS workers gathered the seven children, one of the children ran upstairs in an effort to hide and was retrieved forcibly by defendant Sieck. Id. at 31-32. At approximately 7:30 p.m., the seven children were taken in the rain, without blankets, without car seats for the very young and without necessary medicine,[11] to the Oklahoma County Juvenile Center. Id. ex. D at 35, ex. E at 5, ex. F. When one of the bystanders asked if blankets would be used to cover the children given the rain, defendant Levingston reportedly said: " 'Children of this culture are used to the elements.' " Id., ex. D at 35.
 
 H.
 
 55
 The next day, the Snells learned from counsel of the damaging child prostitution and pornography allegations. Id. at 53-54. Not revealing these damaging allegations earlier is directly contrary to the spirit, and the letter, of DHS regulations concerning mandatory disclosure by social workers in the course of child abuse investigations. See DHS Child Welfare Services-Child Abuse/Preventive Services Procedures Secs. 622.4, 623.7(A)[12] (10/1/84), reproduced in rec. vol. III, doc. 114, ex. I. At the hearing of August 27, 1987, detective Einhorn testified that the allegations of child prostitution and pornography arose in DHS through Asbury[13] and defendants Levingston and Sweptson. Rec. vol. III, doc. 114, ex. O at 68. On cross-examination, he denied having any other information. The allegations of child prostitution and pornography were not even colorable, and all involved concede that a removal order plainly would be unwarranted merely to learn the identities of the children in the Snell household, their relationship to the Snells, and to conduct another review of the licensing situation. See rec. vol. III, doc. 114,; ex. C at 277-78 (Padley); ex. N at 60 (Collins); ex. D1 at 43 (Judge Brown).
 
 II.
 
 56
 Defendants first contend that they are entitled to absolute immunity in this Sec. 1983 action because their activities as social workers are intimately associated with the judicial process. According to defendants, "[r]esponding and investigating reports of child abuse or neglect, requesting assistance from the court in making that response, and accompanying police officers executing orders of the juvenile court are functions intimately associated with the judicial phase of the juvenile court's jurisdiction." Brief of Defendants-Appellants at 29. We reject this broad proposed standard as out of step with absolute immunity precedent.
 
 A.
 
 57
 The Supreme Court has recognized the defense of absolute immunity from civil rights suits in several well-established contexts involving the judicial process. A judge acting in his judicial capacity is absolutely immune from such suits, unless the judge acts clearly without any colorable claim of jurisdiction. Stump v. Sparkman, 435 U.S. 349, 356-57, 98 S.Ct. 1099, 1104-05, 55 L.Ed.2d 331 (1978); Pierson v. Ray, 386 U.S. 547, 553-55, 87 S.Ct. 1213, 1217-18, 18 L.Ed.2d 288 (1967). A prosecutor is absolutely immune for activities which are "intimately associated with the judicial process" such as initiating and pursuing a criminal prosecution. Imbler v. Pachtman, 424 U.S. 409, 430, 96 S.Ct. 984, 994-95, 47 L.Ed.2d 128 (1976). However, the same immunity traditionally does not extend to a prosecutor's actions which may be classified as administrative or investigative. Id. at 430-31, 96 S.Ct. at 994-96; Harlow v. Fitzgerald, 457 U.S. 800, 811 n. 16, 102 S.Ct. 2727, 2734 n. 16, 73 L.Ed.2d 396 (1982). Witnesses, including public officials and private citizens, are immune from civil damages based upon their testimony. Briscoe v. La Hue, 460 U.S. 325, 341, 345-46, 103 S.Ct. 1108, 1120-21, 75 L.Ed.2d 96 (1983). In deciding questions of immunity, the Court has taken a functional approach after considering the history of common law immunity. Thus, in Butz v. Economou, 438 U.S. 478, 508, 515-17, 98 S.Ct. 2894, 2915-16, 57 L.Ed.2d 895 (1978), the Court determined that agency officials who initiate and prosecute enforcement proceedings subject to agency adjudication are entitled to absolute immunity.
 
 
 58
 The rationale for according absolute immunity in the civil rights context is to incorporate traditional common law immunities[14] and to allow functionaries in the judicial system the latitude to perform their tasks absent the threat of retaliatory Sec. 1983 litigation. Because the judicial system often resolves disputes that the parties cannot, the system portends conflict. Win or lose, a party may seek to litigate the constitutionality of circumstances which required him to endure a lawsuit or suffer defeat. Such suits by dissatisfied parties might target judges, see Valdez v. City & County of Denver, 878 F.2d 1285 (10th Cir.1989), prosecutors and witnesses. Cf. Mitchell, 472 U.S. at 523, 105 S.Ct. at 2813-14. Though such suits might be satisfying personally for a plaintiff, they could jeopardize the judicial system's ability to function.
 
 
 59
 Absolute immunity has its costs because those with valid claims against dishonest or malicious government officials are denied relief. Imbler, 424 U.S. at 427, 96 S.Ct. at 993; Valdez, 878 F.2d at 1289. Still, the Court has determined that the smooth functioning of the judicial system takes precedence over those meritorious claims which will be foreclosed by granting absolute immunity. Such claims may find partial resolution through other means, however. The opportunity for subsequent judicial review of decisions made by prosecutors and for subsequent appellate review of lower court decisions provides a check upon actions clothed with absolute immunity. Mitchell, 472 U.S. at 522-23, 105 S.Ct. at 2813-14. And the grant of absolute immunity does not insulate an official from the criminal process or professional discipline. Imbler 424 U.S. at 429, 96 S.Ct. at 994.
 
 
 60
 Thus, "[a]bsolute immunity is ... necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation." Butz, 438 U.S. at 512, 98 S.Ct. at 2913. A judge must be free to make decisions, often controversial, without concern about possible personal repercussions. Stump, 435 U.S. at 363-64, 98 S.Ct. at 1108-09. In deciding which cases to pursue and how they should be pursued, a prosecutor should not be distracted by the threat of subsequent and time-consuming and duplicative civil rights actions. Imbler, 424 U.S. at 424-26, 96 S.Ct. at 992-93. Likewise, a witness must be free to testify without fear of a later civil action, so as not to deter witnesses or influence their testimony. Briscoe, 460 U.S. at 333, 103 S.Ct. at 1114.
 
 
 61
 The more distant a function is from the judicial process, the less likely absolute immunity will attach. Thus, in Malley v. Briggs, 475 U.S. 335, 340-41, 106 S.Ct. 1092, 1095-96, 89 L.Ed.2d 271 (1986), the Supreme Court reaffirmed that an officer applying for a warrant is not absolutely immune from suit, just as a complaining witness would not be entitled to such immunity. The Court reasoned that applying for a warrant "while a vital part of the administration of criminal justice, is further removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment." Id. The Court viewed a prosecutor's seeking an indictment as "the first step in the process of seeking a conviction," id. at 343, 106 S.Ct. at 1097; application for a warrant often precedes this first step and serves a different function.
 
 B.
 
 62
 Several lower courts have considered whether those involved in child protection and advocacy, including social workers and guardians ad litem, are entitled to absolute immunity. Consistent with Supreme Court precedent, the courts have taken a functional approach rather than one based purely on the status of the defendant involved. See Forrester v. White, 484 U.S. 219, 224, 108 S.Ct. 538, 542-43, 98 L.Ed.2d 555 (1988). The courts have looked to the particular task a defendant was performing and its nexus to the judicial process rather than deciding that social workers or guardians ad litem as a class are entitled to absolute immunity. Although child dependency proceedings are civil in nature, they occur against a backdrop of potential criminal prosecution of the abusive parent or caretaker. A social worker's investigation may result in the removal of children from the home and a referral to the district attorney for potential prosecution of a parent or caretaker. Thus, the civil nature of child dependency proceedings, per se, has not been a bar to absolute immunity for social workers. See Meade v. Grubbs, 841 F.2d 1512, 1532-33 n. 18 (10th Cir.1988) (extending absolute immunity to duty to initiate civil complaint after applying functional analysis).
 
 
 63
 The Ninth Circuit has adopted a rule of absolute immunity for child and dependency proceedings from origination until conclusion. In Meyers v. Contra Costa County Dep't of Social Serv., 812 F.2d 1154, 1157 (9th Cir.), cert. denied, 484 U.S. 829, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987), the court held that "social workers are entitled to absolute immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child and dependency proceedings." However, absolute immunity did not extend to a social worker's ordering a father to stay away from his home prior to a scheduled court hearing because such a function was not quasi-prosecutorial or quasi-judicial. Id. at 1157-58. Such conduct was not that of an advocate, but rather unilateral action prior to the operation of the judicial process. Id. at 1157.
 
 
 64
 Relying upon Meyers, the Ninth Circuit has held that a social worker seeking a court order for immediate apprehension of a newborn from her natural mother is entitled to absolute immunity for such quasi-prosecutorial conduct. Coverdell v. Department of Social & Health Serv., 834 F.2d 758, 764 (9th Cir.1987). In Coverdell, the social worker completed an affidavit used by the prosecutor in obtaining custody of the child. Id. at 760. Under a theory of quasi-judicial immunity, the court determined that the social worker was entitled to absolute immunity for executing the order by obtaining custody of the child and removing her from the hospital. Id. at 764-65. Most recently, the Ninth Circuit determined that absolute immunity for a social worker extends beyond the adjudication of dependency to final disposition of the case. Babcock v. Tyler, 884 F.2d 497, 503 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1118, 107 L.Ed.2d 1025 (1990). Accordingly, social workers who had placed two children in a home where they were sexually abused were afforded absolute immunity. Id.
 
 
 65
 The Sixth Circuit also has decided a trilogy of cases which help define the limits of absolute immunity for social workers handling child protection and advocacy matters. In Kurzawa v. Mueller, 732 F.2d 1456, 1457-58 (6th Cir.1984), the court determined that social workers involved in prosecuting neglect and delinquency petitions in the Michigan courts were entitled to absolute immunity, along with a guardian ad litem who participated in proceedings leading to the removal of a child from his parents' home. Id. at 1457-58; see also Gardner v. Parson, 874 F.2d 131, 144-46 (3rd Cir.1989) (guardian ad litem who testifies in court, prosecutes custody or neglect petitions, or makes reports and recommendations to court entitled to absolute immunity). Thus, social workers filing a juvenile abuse petition which resulted in a temporary emergency custody order were entitled to absolute immunity. Salyer v. Patrick, 874 F.2d 374, 378 (6th Cir.1989); accord Vosburg v. Department of Social Serv., 884 F.2d 133, 135 (4th Cir.1989). However, opening a child abuse case, investigating it and placing a parent's name in a central registry concerning child abuse are not quasi-prosecutorial activities for which absolute immunity applies. Achterhof v. Selvaggio, 886 F.2d 826, 830-31 (6th Cir.1989). Rather, these activities are administrative or investigative. Id.
 
 
 66
 Several cases applying a functional approach have declined to grant absolute immunity to social workers investigating child abuse allegations. In Spielman v. Hildebrand, 873 F.2d 1377, 1382-83 (10th Cir.1989), we declined to grant absolute immunity to a Kansas social worker and her supervisor based upon a decision to remove two children in preadoptive status from the home of the potential parents without an agency hearing. Applying a functional approach, we noted that the defendants' actions "in no way related to advocacy before a judicial body," and were not otherwise integral to the judicial process. Id. at 1383. Rather, the defendants' decision to remove the children from the home was unilateral and occurred before the judicial process intervened; accordingly, only qualified immunity was appropriate. Id.
 
 
 67
 An important prerequisite of absolute immunity in this context is that the defendant social worker "act as an actual functionary of the court, not only in status or denomination but in reality." Gardner, 874 F.2d at 146. When the activity of the social worker is not integral to the judicial process, absolute immunity is not warranted. Spielman, 873 F.2d at 1383. In Hodorowski v. Ray, 844 F.2d 1210, 1214 (5th Cir.1988), the court determined that the seizure of children in the absence of a court order under Texas law would not be protected by absolute immunity. The court reasoned that
 
 
 68
 seizure without a court order in the face of an immediate danger seems to us more akin to the function of police than prosecutors. Policemen, not prosecutors, investigate dangerous situations and are charged with the duty, if necessary, to intervene to prevent injury. But policemen, like most other executive officials, are ordinarily not protected by absolute immunity ... unless they are engaged in a function integral to the judicial process, such as testifying as witnesses....
 
 
 69
 Id. (citations omitted). Likewise, in Austin v. Borel, 830 F.2d 1356, 1361-63 (5th Cir.1987), the court determined that the filing of an allegedly false verified complaint, which under Louisiana law initiated temporary custody of a child, but did not initiate the judicial process concerning need of care proceedings, was not entitled to absolute immunity. The court analogized the filing of a verified complaint by a child abuse worker to the seeking of an arrest warrant by a police officer; because absolute immunity would be inappropriate in the latter case, so too would it be inappropriate in the former. Austin, 830 F.2d at 1362.
 
 C.
 
 70
 We next consider the authority of the DHS in this matter. DHS has the authority to investigate complaints concerning whether a child care facility is required to be licensed under the Child Care Licensing Act, Okla.Stat.Ann. tit. 10, Secs. 401-410 (West 1987). Id. Sec. 401(b) (necessity of license), Sec. 402(2) (child care facility defined), Sec. 403(b) (Act applies to private child care facilities), Sec. 405(b) (prior to issuance of license, DHS "shall investigate the activities and standards of care of the applicant"); DHS Division of Child Welfare Services-Policy and Procedure-Licensing Secs. 661 & 689 (3/15/79) (investigation of complaints), reproduced in rec. vol. III, doc. 114, ex. M. DHS is granted authority to investigate the conditions of a licensed child care facility and to require information concerning the children being cared for by the facility. Okla.Stat.Ann. tit. 10, Sec. 406 (West 1987). DHS also has authority to investigate complaints of child abuse and neglect.[15] Okla.Stat.Ann. tit. 21, Secs. 845, 846 (West Supp.1990); DHS Child Welfare Services-Child Abuse/Preventive Services Procedures Sec. 621 (10/1/84), reproduced in, rec. vol. III, doc. 114, ex. I.
 
 
 71
 Under Oklahoma law, a preliminary inquiry shall precede the filing of a petition to adjudicate the status of an allegedly deprived child. Okla.Stat.Ann. tit. 10, Secs. 1101(10), 1103(A) & (C) (1987 & 1990 Supp.). The purpose of the preliminary inquiry is to determine whether court action is necessary and to allow for informal adjustment. See id. & id. Secs. 1101(1) & 1103(B). In Oklahoma County, where the events in this case took place, this function is accomplished by the Juvenile Bureau. See Okla.Stat.Ann. tit. 10, Secs. 602(1), 1201(A), 1204(A) (West 1987). Thereafter, "[a] petition in a juvenile proceeding may be filed by the district attorney or the person who is authorized to make a preliminary inquiry to see if further action is necessary." Id. Sec. 1103(B). "The petition is the first formal legal document filed with the court and initiates Juvenile Court proceedings." DHS Child Welfare Services-Child Abuse/Preventive Services Procedures Sec. 624.11 (10/1/84), reproduced in rec. vol. III, doc. 114, ex. I. When the petition is filed, the district court obtains jurisdiction over the child alleged to be deprived. Okla.Stat.Ann. tit. 10, Sec. 1102(A) (West Supp.1990).
 
 
 72
 Frequently, however, a child may be taken into custody before a preliminary inquiry is completed or a petition is filed. When a child is taken into custody before the filing of a petition, a petition generally must be filed and a summons issued within five judicial days. Id. Sec. 1104.1(A) (West 1987); DHS Child Welfare Services-Child Abuse/Preventive Services Procedures Sec. 624.11 (10/1/84), reproduced in rec. vol. III, doc. 114, ex. I. If a child is taken into custody as a deprived child, see Okla.Stat.Ann. tit. 10, Sec. 1104(d) (West Supp.1990), the "child shall be taken immediately before a judge of the district court for the purpose of obtaining an order for protective custody." Id. Sec. 1107(B). The parents or guardians are entitled to a hearing within forty-eight hours. Id. Sec. 1104.1(C) (West 1987); DHS Child Welfare Services-Child Abuse/Preventive Services Procedures Sec. 623.7(c) (10/1/84), reproduced in rec. vol. III, doc. 114, ex. I; see also Okla.Stat.Ann. tit. 10, Sec. 1107(C) (West 1990) (detention hearing must be held within one or two judicial days, otherwise child shall not be detained).
 
 
 73
 In this case, an application was filed and an order for conditional protective custody issued before a preliminary inquiry or petition. Judge Brown indicated that in practice an order for protective custody frequently precedes a petition. Rec. vol. I, doc. 131, ex. 17 at 75. Other courts have determined that social workers filing pleadings for temporary custody in advance of a formal petition are entitled to absolute immunity. Vosburg, 884 F.2d at 134; Salyer, 874 F.2d at 378. We think that this case requires a different outcome for two reasons. First, the application which resulted in the pick-up order was pre-adjudicatory and sought information which would be developed in other pre-adjudicatory procedures such as court intake or a preliminary inquiry that occur prior to the filing of a petition. See Okla.Stat.Ann. tit. 10, Secs. 1101(8) & (10), 1102(A) (West Supp.1990) ("Upon the filing of a petition, the district court shall have jurisdiction of any child who is alleged to be ... deprived...."). In this respect, the statutory scheme in Oklahoma, insofar as DHS is concerned, is similar to the Louisiana scheme construed by the Fifth Circuit in Austin; we think that the Austin approach is equally applicable to this case. See 830 F.2d at 1361-63. A social worker seeking a pre-petition order for protective custody functions like a police officer seeking an arrest warrant; a functional approach to immunity requires that those performing like functions receive like immunity. Austin, 830 F.2d at 1362.
 
 
 74
 The second reason why absolute immunity is not appropriate is that DHS policy indicates that DHS child welfare workers normally are to report findings of neglect or abuse, even those which might indicate a need for immediate intervention, to other authorities for further investigation or advocacy in the form of initiation of court proceedings.[16] All of the challenged actions of defendants Sweptson, Sieck and Levingston pertain to a DHS investigation of the Snells, an attempt to create a factual basis to justify intervention and confirm allegations predominantly, if not wholly, the product of speculation and conjecture. The defendants unsuccessfully sought police participation in their investigation before Judge Brown issued his order. Moreover, defendants Sieck and Levingston assisted with the investigation made possible by the court's order--a function associated with police work, not advocacy.
 
 
 75
 We agree with the district court that child welfare workers investigating claims of child abuse are analogous to law enforcement officers who are entitled only to qualified immunity. Snell, 698 F.Supp. at 1557. We also reject the defendants' argument that public policy requires absolute immunity because claims of child abuse are involved. See Robison v. Via, 821 F.2d 913, 919-20 (2d Cir.1987) (rejecting absolute immunity for child abuse investigations on policy grounds and accepting "strong" argument for qualified immunity). We do so for two reasons. First, immunity is strictly construed; we do not function as a legislature in enacting immunity grounds. See Harlow, 457 U.S. at 811, 102 S.Ct. at 2734-35; Imbler, 424 U.S. at 421, 96 S.Ct. at 990-91. Second, as stated by the district court:
 
 
 76
 While the tasks of social workers who investigate child protection matters are clearly matters of compelling interest and importance to the public, how can it be said that when these investigators allegedly violate a citizen's constitutional rights they are entitled to absolute immunity, when highly trained FBI, DEA and Treasury agents facing identical allegations are entitled to only qualified immunity?
 
 
 77
 Snell, 698 F.Supp. at 1557. To this we might add that police officers engaged in the same conduct alleged in this case would not be entitled to absolute immunity. Austin, 830 F.2d at 1362. Thus, we overrule Oklahoma federal district court decisions which have determined that absolute immunity is appropriate for DHS social workers, to the extent that these decisions are inconsistent with the rule we announce today. See, e.g., Snook v. Lunsford, No. 87-C-550-B unpub. order (N.D.Okla. Mar. 24, 1988); Guest v. Moore, 706 F.Supp. 786, 787-88 (W.D.Okla.1987).
 
 
 78
 The actions of defendants Sweptson, Sieck and Levingston cannot be said to be integral to the judicial process, rather the DHS activity was more akin to police work. The licensing issue had been resolved in the Snell's favor by DHS licensing division personnel in April 1987; however, DHS elected to reexamine the factual basis of the issue shortly thereafter and needed more information. The three subsequent referrals concerning neglect and abuse in the Snell home were investigated by DHS, and the DHS brought the results of that investigation to the attention of the district attorney's office, as normal procedure envisions. When the district attorney refused to become involved, the DHS defendants pursued the investigation further by contacting the police, who would not assist the investigation without a court order, and the district attorney, who again would not pursue the investigation because of a lack of evidence. Viewed in the light most favorable to the plaintiffs, the summary judgment evidence indicates that these defendants assisted or acquiesced in the use of information known to be false concerning the Snells, i.e., involvement in child prostitution and pornography, in order to further the licensing investigation[17] and retaliate against the Snells. The use of that false information, as conveyed to Judge Brown, was undoubtedly responsible for the furtherance of the investigation by use of a court order to gain entry into the Snell home and custody of the seven children for which the Snells could not produce court custody documents. Accordingly, defendants Sweptson, Sieck and Levingston are not entitled to absolute immunity.[18]
 
 D.
 
 79
 The issue of absolute immunity is more difficult with respect to defendant Padley, the assistant general counsel of DHS who compiled the information and presented the application to Judge Brown. We note that the Second Circuit granted absolute immunity to a child protective services department attorney who initiated and prosecuted child protective orders. Walden v. Wishengrad, 745 F.2d 149, 152 (2d Cir.1984). In that case, the attorney had taken steps to compel a witness to attend a hearing to terminate parental rights. Id. at 150.
 
 
 80
 In this case, the federal district court denied defendant Padley absolute immunity on two grounds: 1) she was acting in an investigative capacity, and 2) even if she was acting in a quasi-prosecutorial capacity, she ventured outside her duties to perform a quasi-prosecutorial task. Snell, 698 F.Supp. at 1558. The district court relied heavily upon defendant Padley's admissions. Padley stated that "[t]he whole purpose of the application was to obtain the assistance of the [state] court to complete an investigation as to allegations." Rec. vol. III, doc. 114, ex. C at 172. Padley also was aware that normally such applications would be filed by the district attorney or attorney general's office; indeed she had never drafted an application of this type before. Id. at 169-71.
 
 
 81
 We would have no problem affirming the district court's decision concerning the investigative nature of some of defendant Padley's activities had the plaintiffs come forward with evidence indicating that defendant Padley only engaged in the "preliminary gathering of evidence that may ripen into a potential prosecution." Gobel v. Maricopa County, 867 F.2d 1201, 1204 (9th Cir.1989). For we have held that a prosecutor who interrogates a suspect in the first instance is fulfilling an investigative, rather than a prosecutorial, function. Rex v. Teeples, 753 F.2d 840, 844 (10th Cir.), cert. denied, 474 U.S. 967, 106 S.Ct. 332, 88 L.Ed.2d 316 (1985). Moreover, the Second Circuit in Robison, 821 F.2d at 918-19, has held that an attorney who assists a police officer in investigating a child abuse complaint is merely part of the "preliminary investigative process," and is not entitled to absolute judicial immunity.
 
 
 82
 In this case, the rule concerning absolute immunity for prosecutorial functions and not for investigative or administrative functions is easier to state than apply. Although absolute immunity applies to initiating and presenting a prosecution, the Supreme Court has recognized that some duties prior to the initiation of a prosecution are also protected. Imbler, 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33. Preparing to initiate a prosecution may necessitate obtaining, reviewing and evaluating evidence; absolute immunity may attach when these functions are necessary so that a prosecutor may fulfill his function as an officer of the court. See id.; Grant v. Hollenbach, 870 F.2d 1135, 1138 (6th Cir.1989) (decision of prosecutor to investigate a criminal charge entitled to absolute immunity); Gobel, 867 F.2d at 1204 (actions undertaken as part of the preparation of the prosecutor's case are absolutely immune, even if such actions could be characterized as "investigative" or "administrative"); Auriemma v. Montgomery, 860 F.2d 273, 278 (7th Cir.1988) (extra-judicial investigation by government attorneys not entitled to absolute immunity); Marx v. Gumbinner, 855 F.2d 783, 792 (11th Cir.1988) (prosecutor entitled to absolute immunity for investigation necessary to prepare case such as interviewing witnesses before presenting them to a grand jury or interviewing the victim of a crime).
 
 
 83
 We have held that a critical factor for absolute prosecutorial immunity "involves a prosecutor's acts as an advocate before a neutral magistrate." Lerwill v. Joslin, 712 F.2d 435, 437 (10th Cir.1983). Thus, a prosecutor who participates in an illegal search, issues a libelous press release, assists with an unlawful sale of seized property or orders a warrantless arrest ordinarily will not be entitled to absolute immunity. Id. at 437. On the other hand, a prosecutor who performs functions within the continuum of initiating and presenting a criminal case, such as filing charges, seeking an arrest warrant or advocating conditions of release, ordinarily will be entitled to absolute immunity. Id. at 439. "Although identifying those acts entitled to absolute immunity is not always easy, the determinative factor is 'advocacy' because that is the prosecutor's main function and the one most akin to his quasi-judicial role." Rex, 753 F.2d 843.
 
 
 84
 Here, some evidence indicates that Judge Brown told defendant Padley to prepare an application based, at least in part, upon earlier ex parte representations concerning the Snells that were made to the judge by detective Einhorn. Rec. vol. I, doc. 96, ex. 2 at 31-32 (Brown depo.); id. vol. III, doc. 114, ex. C at 169 (Padley depo.). We have found no summary judgment evidence indicating that Padley directed Einhorn to Judge Brown. Rather, it appears that Einhorn contacted the judge by telephone before defendant Padley was sought out by the judge. Rec. vol. I, doc. 96, ex. 2 at 30-31. The judge now says that he was willing to issue a detention order based on his conversation by Einhorn, but he did not have it prepared when Einhorn appeared in person an hour later. Id. at 31. When Einhorn appeared and the order was not prepared, Judge Brown requested that Padley coordinate the supporting information.
 
 
 85
 Thus, Padley appeared before a neutral judge at the judge's express suggestion; she was not acting unilaterally.[19] She was directed to coordinate existing information, not pursue further investigation. Indeed, Judge Brown testified on deposition that he would have issued the order based upon the oral representations of Detective Einhorn. Rec. vol. I, doc. 96, ex. 2 at 62-63. However, that is not what happened. In the application she prepared, Padley matched the existing allegations with citations to the statutes concerning child abuse and neglect, deprived children, and licensing, and then she requested relief: that the court "provide whatever assistance ... the Court deems appropriate in order to protect children and assist DHS in completing child abuse and licensing investigations of the Snell[ ] home." Id. ex. 4 at 2. Under current Rules of Professional Conduct, Padley might have an obligation to make a more complete presentation;[20] however, that issue goes to the merits of Padley's conduct, not to its function. Thus, we characterize Padley's conduct in preparing and presenting the application before the judge as advocacy by an officer of the court, not police investigation. Any investigation done by defendant Padley was incident to her filing the application. Even viewed in the light most favorable to the plaintiffs, the summary judgment evidence simply does not show that defendant Padley originated or augmented the false information which was contained in the application for an order. Accordingly, we reject the district court's characterization of Padley's conduct as investigative which would deprive her of absolute immunity.
 
 
 86
 The district court held in the alternative that Padley would not be entitled to absolute immunity because she "ventured outside her normal duties to perform a quasi-prosecutorial function." Snell, 698 F.Supp. at 1588. A judge may act in excess of his subject matter jurisdiction and still retain absolute judicial immunity; only in the unusual circumstances of complete and clear absence of all jurisdiction is absolute immunity inappropriate. Stump, 435 U.S. at 356-57, 98 S.Ct. at 1104-05. We have relied upon this analogous concept to discuss the contours of absolute prosecutorial immunity. Lerwill, 712 F.2d at 439. While a prosecutor might lose absolute immunity when he acts with a complete and clear absence of authority, such a condition does not occur when a prosecutor has an arguable basis of authority grounded in a statute. Id. at 440. In Lerwill, we determined that a part-time city attorney was entitled to absolute immunity for initiating a prosecution based on state felony statutes, although he was only authorized to prosecute under city misdemeanor ordinances. Id. at 436. We held that
 
 
 87
 a prosecutor who initiates a prosecution under statutes he is not authorized to invoke is immune from a section 1983 suit for damages when two conditions are satisfied: 1) the prosecutor is arguably empowered to prosecute the alleged conduct under some statute, and 2) the statute he incorrectly invokes also arguably applies to the criminal defendant's alleged conduct.
 
 
 88
 Id. at 440 (footnote omitted). Because both conditions were satisfied, absolute immunity applied.
 
 
 89
 The district court stated that "Oklahoma law and long established practice envisions that the District Attorney shall perform such [prosecutorial] acts on behalf of DHS." Snell, 698 F.Supp. at 1558. Given the various allegations in this case, we find the matter slightly more complicated. Padley, as assistant general counsel of DHS, may represent the department in some matters given the statute empowering the DHS legal division. Okla.Stat.Ann. tit. 56, Sec. 236 (West 1969); City of Sand Springs v. Department of Public Welfare, 608 P.2d 1139, 1150 (Okla.1980).
 
 
 90
 With respect to proceedings concerning licensing under the Child Care Facilities Act, however, DHS is to be represented by the attorney general or the district attorney. Okla.Stat.Ann. tit. 10, Sec. 408 (West 1987) (in legal proceedings, attorney general represents DHS), Sec. 409 (when injunction is sought by DHS, suit is brought by the attorney general or district attorney); see also DHS Division of Child Welfare Services-Policy and Procedure-Licensing Secs. 667.23 (3/15/79), reproduced in rec. vol. III, doc. 114, ex. M (if owner or operator of child care facility continues to operate after adverse final decision on licensing, "the State Director may request the Attorney General or the appropriate District Attorney to secure a civil injunction or initiate criminal proceedings.").
 
 
 91
 The criminal statutes prohibiting child abuse and neglect, Okla.Stat.Ann., tit. 21, Secs. 843 & 843.1 (West 1983 & Supp.1990), are enforced by the district attorney, id. tit. 19, Sec. 215.4 (West 1988 & Supp.1990). The district attorney and Juvenile Bureau have the authority to file a petition seeking an adjudication of an alleged deprived child. Okla.Stat.Ann. tit. 10, Secs. 1103(B), 1204(a) (West 1987). Defendants contend that "[t]here is no statutorily prescribed procedure for securing juvenile court orders prior to the filing of an adjudicatory petition under Oklahoma law, although the juvenile court clearly may issue such orders." Appellants' Reply Brief at 8 (citing Okla.Stat.Ann. tit. 10, Secs. 1104(d), 1104.1 & 1107(B) (West 1987 & Supp.1990)). Former assistant district attorney McNeese testified on deposition that the "policies and procedures regarding pick-ups changed" as the presiding judge of the juvenile division changed. Rec. supp. vol. II, doc. 115, ex. J at 12.
 
 
 92
 Based upon our review of the statutory scheme, we are inclined to agree that the procedure for obtaining a pick-up order was not entirely clear. However, at the time of the events in question, it is uncontroverted that normal procedure resulted in this function being handled by the police or the district attorney, not DHS. Rec. vol. II, ex. J at 11 (McNeese depo.). As noted previously, DHS policy envisions that other agencies will determine what steps should be taken when allegations of abuse and neglect cannot be fully investigated by DHS child welfare workers. In very unusual circumstances, such as when it would be impossible to contact the appropriate authorities (e.g., district attorney, Juvenile Bureau, police), DHS policy apparently allows an application directly to the district court for emergency placement. See DHS Child Welfare Services-Child Abuse/Preventive Services Procedures Sec. 623.3 (10/1/84), reproduced in rec. vol. III, doc. 114, ex. I. However, there are no circumstances in this case which would justify DHS assuming this authority.
 
 
 93
 We need not decide the difficult issue of if and when DHS counsel has authority to apply directly to the court for emergency investigative assistance or custody, because DHS clearly lacked authority in this case. The record is uncontroverted that DHS repeatedly approached the district attorney's office to take action and that office exercised its prosecutorial discretion not to proceed. DHS even contacted the police, who refused to intervene without a court order. Defendant Padley had never prepared or filed such an application before, and she was unaware of any previous DHS precedent for such an application. Rec. vol. III, doc. 114, ex. C at 271-72. In these circumstances, we do not believe that the statutory schemes concerning licensing and alleged deprived children envision an end-run by DHS to override the prosecutorial discretion exercised by the offices of the district attorney or even the attorney general. Granted, DHS has express authority to investigate licensing matters, Okla.Stat.Ann. tit. 10, Sec. 405 (West 1987), and the DHS is charged with investigating reports of child neglect and abuse, id. tit. 21, Sec. 846(A) (West Supp.1990). Even so, this general authority did not justify an end-run around the district attorney so as to take legal action.
 
 
 94
 Absolute immunity is "strong medicine" and government officials "who seek exemption from personal liability have the burden of showing that the exemption is justified by overriding considerations of public policy." Forrester, 484 U.S. at 224, 230, 108 S.Ct. at 542, 545-46. In this case, defendant Padley has not made that showing. The purpose of absolute prosecutorial immunity would be ill-served by granting it in cases when the defendant acts without colorable authority. Moreover, the very attribute that absolute prosecutorial immunity is meant to protect--prosecutorial discretion--would not be served were we to grant absolute immunity here because defendant Padley's activities were an attempt to supersede the very prosecutorial discretion vested in the district attorney's office. We conclude that although defendant Padley was functioning as a prosecutor, she did so without color of authority in these circumstances and absolute immunity is not warranted.
 
 III.
 
 95
 The issue of whether defendant Sweptson, Sieck, Levingston and Padley are entitled to qualified immunity remains. In evaluating the defense of qualified immunity, we compare the "objective reasonableness" of the conduct complained of with the state of the law at the time of the alleged violation. Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. For plaintiffs to defeat a claim of qualified immunity, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).
 
 
 96
 Once a defendant raises the defense of qualified immunity, the plaintiffs must "come forward with facts or allegations to show both that the defendant's alleged conduct violated the law and that law was clearly established when the alleged violation occurred." Pueblo Neighborhood Health Ctrs. v. Losavio, 847 F.2d 642, 646 (10th Cir.1988). The defendant prevails unless such a showing is made on both elements;[21] however, even if the plaintiff makes such a showing, the defendant still may prevail if he can establish "extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard." Harlow, 457 U.S. at 819, 102 S.Ct. at 2738.
 
 
 97
 The qualified immunity standard serves to minimize interference with government officials performing discretionary governmental functions and "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley, 475 U.S. at 341, 106 S.Ct. at 1096. Qualified immunity is a legal, not a factual, issue which must be resolved in the first instance by the trial court. Pueblo, 847 F.2d at 646. On appeal, the issue is straightforward, even if its resolution often is not: Do the facts alleged by the plaintiffs support a violation of clearly established law of which a reasonable person would have known? Mitchell v. Forsyth, 472 U.S. at 528 n. 9, 105 S.Ct. at 2816 n. 9; Davis v. Scherer, 468 U.S. 183, 191, 104 S.Ct. 3012, 3017-18, 82 L.Ed.2d 139 (1984). This is an objective legal inquiry, though fact-specific. Anderson, 483 U.S. at 641, 107 S.Ct. at 3039-40. We have recognized that when a plaintiff can point to specific facts of defendant's improper motivation, qualified immunity may be inappropriate due to "a conflict sufficiently material to defendant['s] claim of immunity to require [him] to stand trial." DeVargas v. Mason & Hanger-Silas Mason Co., 844 F.2d 714, 719 (10th Cir.1988); Pueblo, 847 F.2d at 649-50; Wright v. South Ark. Regional Health Ctr., 800 F.2d 199, 203 (8th Cir.1986) (cited in DeVargas ).
 
 
 98
 As an initial matter, we note that several cases arising under a variety of constitutional theories have granted qualified immunity to those investigating claims of child abuse or neglect when there were circumstances which made it appear that the children were in danger and there was evidentiary support for such an assessment. See, e.g., Landstrom v. Illinois Dep't of Children & Family Servs., 892 F.2d 670, 674-78 (7th Cir.1990) (fourth and fourteenth amendment claims; complaint by child of soreness); Doe v. Hennepin, 858 F.2d 1325, 1329-30 (8th Cir.1988) (fourteenth amendment claim for deprivation of liberty and property interest; informant alleged that father engaged in sexual abuse of child), cert. denied, 490 U.S. 1108, 109 S.Ct. 3161, 104 L.Ed.2d 1023 (1989); Hodorowski, 844 F.2d at 1217 (family integrity claim; anonymous report that father chased children in yard with chain; social workers saw bruises and were told of more bruises by children); Robison, 821 F.2d at 921-22 (due process and excessive force; two schoolmates gave descriptions of ongoing sexual abuse by stepfather of one child, one schoolmate indicated the other child had been beaten, both children appeared to fear reprisal upon inquiry and mother did not appear able to protect children); see also Duchesne v. Sugarman, 566 F.2d 817, 825-26 (2d Cir.1977) (due process; emergency custody appropriate because mother in psychiatric ward and children left unattended). The case before us, however, lacks circumstances indicative of an emergency and there are claims of retaliatory motive which must be considered.
 
 A.
 
 99
 In the claims brought under Sec. 1983, plaintiffs rely upon the first, fourth, fifth and fourteenth amendments. Rec. vol. I, doc. 56 (amended complaint), doc. 38 at 2, doc. 130 at i (unnumbered). As we understand the plaintiffs' claims as refined by the record, see, e.g., rec. vol. I, doc. 130, they are: 1) interference with liberty and privacy interests based upon the foster care relationship with the seven children removed from the home, 2) interference with a liberty interest in plaintiffs' good names which occurred with the dissemination of the false child prostitution and pornography allegations, 3) interference with a reasonable expectation of privacy which occurred when police and the DHS entered and searched plaintiffs' home without probable cause and a warrant, on the authority of an order procured with allegations known to be false, and 4) retaliation due to the Snells' outspoken nature and refusal to be intimidated by DHS pressure, see id., doc. 63 p 13 at 8; rec. supp. vol. II, doc. 150 at 11. As previously noted, we consider only a portion of the third issue as it relates to the denial of qualified immunity to the defendants. Concerning the third issue, we do not have occasion to decide whether a search of a private home without a warrant or probable cause violates the fourth amendment. Courts have reached differing results concerning the difficult issue of the scope of the fourth amendment protection in the context of a child abuse investigation. Compare Darryl H. v. Coler, 801 F.2d 893, 901-02, 904, 907 (7th Cir.1986) (on preliminary record, visual inspection of child's nude body for signs of child abuse does not require probable cause or a warrant, but state's procedures did not insure reasonableness in every case) with Good v. Dauphin County Social Servs., 891 F.2d 1087, 1094 (3rd Cir.1989) (warrantless search of home to investigate alleged child abuse unconstitutional absent consent or exigent circumstances).
 
 B.
 
 100
 The touchstone of the fourth amendment is reasonableness. What differentiates this case from others in which qualified immunity has been granted on fourth amendment claims is that the plaintiffs have come forward with evidence indicating deliberate and willful conduct, specifically, that the defendants knew that any allegations concerning child sexual abuse and the Snells were false, yet they persisted in their attempts to intervene on that very basis. In a due process context, the Eighth Circuit has determined that defendant social workers investigating suspected child abuse were entitled to qualified immunity "unless evidence of malice or improper motives on the part of the defendants is proved." Doe, 858 F.2d at 1329; id. at 1330 (Henley, J., concurring). The court relied upon Myers v. Morris, 810 F.2d at 1457-58, in which the court determined that various police officers investigating suspected child abuse were entitled to qualified immunity based upon a claim of judicial deception. Essentially, the plaintiffs in Myers contended that the officers, in seeking arrest warrants, swearing to complaints and arresting the plaintiffs had deceived judicial officers who found probable cause. Id. at 1454.
 
 
 101
 The claim of judicial deception in Myers is similar to the claim in this case. The court in Myers was careful to explain that subjective bad faith of an officer will not defeat qualified immunity if the officer's conduct was objectively reasonable. Id. at 1457. But at some point, an officer's knowledge of false information may defeat a finding of objective reasonableness:
 
 
 102
 Construed liberally, the allegations of judicial deception may state a claim that the deputies deliberately or recklessly incorporated known falsehoods into their reports, criminal complaints and warrant applications. If this claim were true, then the deputies' sworn representations as to the existence of probable cause would be perjury, or close to it, and perjury is not objectively reasonable conduct.
 
 
 103
 Id. For this theory to survive qualified immunity, a plaintiff must make a substantial showing of deliberate falsehood or reckless disregard for truth, such that would be needed to challenge the presumed validity of an affidavit supporting a search warrant under Franks v. Delaware, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). Myers, 810 F.2d at 1457-58. Likewise, in a Sec. 1983 claim for judicial deception there must be "a specific affirmative showing of dishonesty by the applicant," i.e., knowledge of a plaintiff's innocence or that a witness was lying. Id. Equally important, a plaintiff must establish that, but for the dishonesty, the challenged action would not have occurred. See Franks, 438 U.S. at 171-72, 98 S.Ct. at 2684 ("[I]f when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."); United States v. Page, 808 F.2d 723, 728-29 (10th Cir.1987), cert. denied, 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 683 (1987).
 
 
 104
 As applied to this case, we think that the plaintiffs have demonstrated that the fourth amendment's prohibition against unreasonable searches and seizures is implicated in these circumstances. We need not decide the precise contours of the fourth amendment standard that would apply, however, because the conduct alleged in these cases would violate the most minimal standard of which we can conceive, given that the defendants in this case proceeded on a basis of individualized suspicion. See New Jersey v. T.L.O., 469 U.S. 325, 342 n. 8, 105 S.Ct. 733, 743 n. 8, 83 L.Ed.2d 720 (1985). The plaintiffs have come forward with specific evidence tending to show that the allegations of child abuse were fabricated and that the defendants knew that such allegations were untrue. Plaintiffs also have evidence which tends to show that, but for the allegations of child prostitution and pornography, Judge Brown's order would not have been entered. Allegations of criminal wrongdoing known to be false may not provide the sole basis for probable cause or a warrant. Franks, 438 U.S. at 168, 98 S.Ct. at 2682-83. Nor may they constitute a reasonable basis to suspect wrongdoing which might justify a warrantless search at its inception. See T.L.O., 469 U.S. at 341-42, 105 S.Ct. at 742-43. The evidence is sufficient to indicate that the defendants engaged in a deliberate course of conduct, complete with false information, designed to gain entry into the Snell home. Such information was essential to persuade the juvenile judge to issue the order which the defendants relied upon.
 
 
 105
 In deciding whether the law was clearly established at the time of the incident, there must be some factual correlation between then-existing law and the circumstances confronting the public official. Garcia v. Miera, 817 F.2d 650, 657 (10th Cir.1987) (relying on People of Three Mile Island v. Nuclear Regulatory Comm'rs, 747 F.2d 139, 144-45 (3rd Cir.1984)), cert. denied, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988). "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, not could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. However, in this circuit, precise factual correlation between the then-existing law and the case at-hand is not required, Eastwood v. Dep't of Corrections, 846 F.2d 627, 630 (10th Cir.1988); thus, a then-existing case "on all fours" with the case at hand is not essential. Melton, 879 F.2d at 729 n. 37. While government officials are not required to anticipate developments in the law, they are expected " 'to relate established law to analogous factual settings,' " Eastwood, 846 F.2d at 630 (quoting Three Mile Island, 747 F.2d at 144), and "apply general, well developed legal principles." Three Mile Island, 747 F.2d at 144. This represents "a broad view of what constitutes an established right of which a reasonable person would have known." Sourbeer v. Robinson, 791 F.2d 1094, 1103 (3rd Cir.1986), cert. denied, 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 779 (1987).
 
 
 106
 Was the law clearly established in 1987 that an entry and search of a residence on the basis of known false allegations violated the fourth amendment's proscription against unreasonable searches and seizures? The text of the amendment provides:
 
 
 107
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
 
 
 108
 U.S. Const. am. IV. Regarding the probable cause requirement for a warrant, there is an " 'obvious assumption ... that there will be a truthful showing.' " Franks, 438 U.S. at 164-165, 98 S.Ct. at 2681 (emphasis in original) (quoting United States v. Halsey, 257 F.Supp. 1002, 1005 (S.D.N.Y.1966), aff'd, No. 31369 (2d Cir. Jun. 12, 1967)). In Franks, the Court explained:
 
 
 109
 This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.
 
 
 110
 438 U.S. at 165, 98 S.Ct. at 2681. Likewise, even assuming that the entry and search in this case need be judged only by a reasonableness standard, equally implicit in the concept of reasonableness is that the information on which the social worker proceeds upon is not known to be false.
 
 
 111
 We proceed to consider the situation confronting the DHS and the information which defendants possessed. Anderson, 483 U.S. at 641, 106 S.Ct. at 3039-40. This case does not involve "[a]llegations of negligence or innocent mistake," which plainly would not be sufficient to impeach a probable cause or reasonableness determination. See Franks, 438 U.S. at 171, 98 S.Ct. at 2684. Rather, plaintiffs have made detailed allegations of "deliberate falsity or reckless disregard" concerning the child pornography and prostitution allegations which appear to be the sole reason behind the issuance of the pick-up order. See Franks, 438 U.S. at 171-72, 98 S.Ct. at 2684-85. The evidence indicates that nine DHS social workers had dealt with the Snells since 1981, there were several home visits, the latest occurring in July 1987. That visit resulted in a favorable report, although the Snells would not disclose the identity of the children being cared for in the absence of more justification. DHS, for a purpose not entirely clear, sought information concerning the identity of the children. Even giving special consideration to the facts and circumstances confronting DHS, we are unable to fashion an erroneous, though justifiable, link between the need for the identity information and the procuring of a court order on known false allegations. Although developed in the warrant context, the principles of Franks apply to the information used in this case. We conclude that even in the context of a child abuse investigation, a reasonable public official would have known that using known false information to secure an order to justify entry and search of a private home would violate the fourth amendment's proscription on unreasonable searches and seizures. As we discuss further, plaintiffs have presented "a genuine, material factual issue concerning whether the defendants' conduct violated that right." See Rozek v. Topolnicki, 865 F.2d 1154, 1157 (10th Cir.1989).
 
 C.
 
 112
 Defendants Sweptson, Sieck and Levingston contend that the district court erred in denying them qualified immunity because they "did not prepare, review, present, direct or encourage presentation of the application to Judge Brown." Appellants' Reply Brief at 12. For supervisory liability, plaintiffs must demonstrate an affirmative link between the supervisor's conduct and the constitutional deprivation; liability based upon respondeat superior will not do. Rizzo v. Goode, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976); Kaiser v. Lief, 874 F.2d 732, 736 (10th Cir.1989). Plaintiffs must show that a supervisory defendant, expressly or otherwise, authorized, supervised, or participated in conduct which caused the constitutional deprivation. D.T. by M.T. v. Independent School Dist., 894 F.2d 1176, 1187 (10th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 213, 112 L.Ed.2d 172 (1990); Kaiser, 874 F.2d at 736; Meade v. Grubbs, 841 F.2d 1512, 1527-28 (10th Cir.1988); Kite v. Kelley, 546 F.2d 334, 337 (10th Cir.1976). Concerning a defendant acting in a non-supervisory capacity, there must be cause in fact between the conduct complained of and the constitutional deprivation. See Wulf v. City of Wichita, 883 F.2d 842, 864 (10th Cir.1989); Reimer v. Smith, 663 F.2d 1316, 1322 n. 4 (5th Cir.1982); Bennett v. Passic, 545 F.2d 1260, 1262-63 (10th Cir.1976). But, as stated by the Seventh Circuit:
 
 
 113
 For liability under section 1983, direct participation is not necessary. Any official who "causes" a citizen to be deprived of her constitutional rights can also be held liable. The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.
 
 
 114
 Conner v. Reinhard, 847 F.2d 384, 396-97 (7th Cir.), cert. denied, 488 U.S. 856, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988).
 
 
 115
 Applying these standards, sufficient evidence establishes a causal link between these defendants and the constitutional deprivation alleged.
 
 
 116
 1. In the nature of personal participation, defendant Sweptson signed an allegedly altered CWS-14A report recommending prosecution of the Snells based upon sexual abuse. Defendant Sweptson met with Asbury and detective Einhorn on August 14, 1987 to discuss the investigation of the Snells. Detective Einhorn, at least initially, identified the source of the child prostitution and pornography allegations as defendant Sweptson, along with Asbury and defendant Levingston. Clark Snell testified on deposition that he was threatened with retaliation by defendant Sweptson when he complained about DHS. Defendant Padley indicated that she visited with defendant Sweptson, along with defendants Sieck and Levingston, immediately prior to preparing the application and delivering it to Judge Brown. Defendant Sweptson may have reviewed the order issued by Judge Brown with defendants Padley, Sieck and Levingston before it was enforced.
 
 
 117
 2. Defendants Sieck and Levingston were assigned to the investigation of the Snells which culminated in the entry and search of the Snell residence. FBI agent Treece met with Asbury and defendant Levingston prior to August 26, 1987, and indicated that this was the first time she had heard of the allegations of child prostitution and pornography. Asbury and defendant Levingston attempted to convince others to intervene based upon various theories. Defendant Sieck visited with Judge Brown on August 19 and informed him that the Snells might be moving (a baseless allegation) in an attempt to get the judge to intervene. The next day, defendant Sieck attempted to shop for a district attorney that would issue a removal order based upon an alleged violation of the guardianship statute. Defendant Sieck and Levingston participated in the entry and search of the Snell residence, all the while not reporting the serious child prostitution and pornography allegations to Sharon Snell.
 
 
 118
 3. Finally, defendant Padley prepared the application knowing of an absence of circumstances which might justify bypassing the district attorney's office, which repeatedly had refused to prosecute the same allegations. Although defendant Padley indicated in the application that DHS had received allegations concerning child pornography and prostitution, there were no facts, regardless of whether those facts later were determined to be erroneous, to support such a statement at the time the application was prepared.[22]
 
 IV.
 
 119
 Although the district court had serious doubt about the plaintiffs' conspiracy claim, Snell, 698 F.Supp. at 1563-65, we do not share the same hesitation at this stage. We recently discussed the parameters of a Sec. 1983 conspiracy claim in Dixon v. City of Lawton, 898 F.2d 1443 (10th Cir.1990), and indicated that "a conspiracy to deprive a plaintiff of a constitutional or federally protected right under color of state law" was actionable. We noted, however, that to prevail on such a claim, "a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient." Id. at 1449; Earle v. Benoit, 850 F.2d 836, 844-46 (1st Cir.1988). In this case, plaintiffs argue forcefully for the preservation of their conspiracy claim because, "[p]rovided that there is an underlying constitutional deprivation, the conspiracy claim allows for imputed liability; a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy." Dixon, 898 F.2d at 1449 n. 6.
 
 
 120
 We have determined that the defendants are not entitled to qualified immunity on plaintiffs' fourth amendment claim concerning a search of the Snell home on the basis of known false information. Thus, plaintiffs are entitled to an opportunity to present this constitutional claim to a jury. Concerning whether there is sufficient evidence to find an agreement among these participants to deprive the plaintiffs of a constitutional right, the district court erroneously limited its focus to the date on which the application and resultant search of the home occurred, August 26, 1987. Given that the relationship between DHS and the Snells was ongoing and there were repeated attempts to harass and gain entry into the Snell's home (e.g. August 19, 20, 24 and 26, 1987) we think that the district court's focus was too narrow. While a deprivation of a constitutional right is essential to proceed under a Sec. 1983 conspiracy claim, proof of an agreement to deprive often will require examination of conduct occurring prior to the deprivation. Cameo Convalescent Ctr. v. Senn, 738 F.2d 836, 839-40 (7th Cir.1984), cert. denied, 469 U.S. 1106, 105 S.Ct. 780, 83 L.Ed.2d 775 (1985) (court examined retaliatory conduct and events preceding). In this case, the plaintiffs have adduced sufficient evidence of a single objective by these defendants to retaliate against them which culminated in Judge Brown's order and the resultant search of their home. The fact that some of the participants might not have forseen the exact nature of the deprivation is of no moment:
 
 
 121
 A plaintiff seeking redress need not prove that each participant in a conspiracy knew the "exact limits of the illegal plan or the identity of all the participants therein." Hoffman-LaRoche, Inc. [v. Greenberg], 447 F.2d at 875 [ (7th Cir.1971) ]. An express agreement among all the conspirators is not a necessary element of a civil conspiracy. The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result. To demonstrate the existence of a conspiratorial agreement it simply must be shown that there was "a single plan, the essential nature and general scope of which [was] know to each person who is to be held responsible for its consequences." Id.
 
 
 122
 Hampton v. Hanrahan, 600 F.2d 600, 621 (7th Cir.1979), rev'd in part on other grounds, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); see also Cameo Convalescent Ctr., 738 F.2d at 841. Frequently, a conspiracy must be proven with circumstantial evidence because "[r]arely ... will there be direct evidence of an express agreement among all the conspirators to conspire." Bell v. City of Milwaukee, 746 F.2d 1205, 1260 (7th Cir.1984).
 
 
 123
 Applying these standards, we think that the plaintiffs on summary judgment have adduced sufficient circumstantial evidence from which a trier of fact could conclude that these defendants and others reached an agreement to deprive the Snells of a constitutional right based upon the Snells' refusal to identify the children in their care and Clark Snell's complaints about DHS. Referrals to DHS concerning the Snells were singled out and grouped together for special treatment. Asbury indicated that she viewed the complaints made by the Snells as harassment. According to Clark Snell, defendant Sweptson threatened him with arbitrary and capricious governmental action should he not cooperate.
 
 
 124
 Several DHS meetings occurred in which extraneous topics, such as Clark Snell's income and his appliance repair business, were discussed. And Asbury and defendants Sieck and Levingston made repeated attempts, be they ex parte communications with various judges or contacts with the police department, to create a climate ripe for intervention. Plaintiffs' evidence reflects a dogged determination born of concerted effort to take action against the Snells, whatever the means, knowing that the district attorney would not become involved because of a lack of evidence. Whether the plaintiffs can prove their allegations at trial given defendants' contrary evidence is another matter, but that is left for a trial consistent with this opinion.
 
 
 125
 AFFIRMED AND REMANDED.
 
 
 
 *
 The Honorable Dale E. Saffels, United States District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 The district court dismissed Judge Brown as a defendant. Snell, 698 F.Supp. at 1543 n. 1. The parties stipulated to the dismissal of defendant Lissa Vernon. Id. at 1544. Summary judgment was granted in favor of defendants Asbury, id. at 1565, and Tunnell, id. at 1544
 
 
 [2]
 The district court has done an admirable job of distilling the pleadings into a lengthy set of undisputed facts, and facts deemed established for purposes of summary judgment, viewing the evidence in the light most favorable to the plaintiffs who opposed a grant of absolute or qualified immunity, Anderson v. Liberty Lobby, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986). See Snell, 698 F.Supp. at 1548-56. Our factual summary differs only slightly from that of the district court
 
 
 [3]
 The report contains the following questions:
 1) How many of these children were legally adopted by the Snells' [sic]?
 2) How many children reside in this home by actual parental agreement or a guardianship order?
 3) Are Mr. and Mrs. Snell continuing to provide short term/long term care for children in the absence of their parents?
 4) Is the Snell home an actual extension of the Jesus House thereby requiring a certificate of need and other licensing requirements as set forth by the State of Oklahoma?
 5) Are the donations received by Mr. and Mrs. Snell going directly to provide for these children's needs?
 6) Are the lives of these children in jeopardy because this home appears to be exempt from all-City-County-State-Federal licensing requirements as well as prudent judicial review concerning issues of custody and placement of minor children in the absence of their parents?
 Rec. vol. II, doc. 115, ex. V.
 
 
 [4]
 Plaintiffs have provided evidence which indicates that the CWS 14-A report produced for discovery differs from the original and omits allegations of child abuse, child pornography and child prostitution. See rec. vol. II, doc. 115, ex. J at 39-41
 
 
 [5]
 Jesus House is a shelter for the homeless. The Snells have worked there as volunteers and remain in contact with the personnel who operate the shelter
 
 
 [6]
 Detective Einhorn testified on deposition that his department did not routinely investigate licensing violations. Rec. supp. vol. II, doc. 150, ex. G at 54
 
 
 [7]
 Okla.Stat.Ann. tit. 58, Sec. 773 (West 1965), then provided:
 No person shall be appointed guardian of any minor or minors, or other person or persons who is, at the time of the hearing of the application for appointment, the guardian of as many as five persons, other than his or her own family or relatives; provided that the provisions of this Section and Section 774 of this Title shall not apply to boards of control and superintendents of eleemosynary or charitable institutions, under the control and charge of the State, where under the law such boards of control and superintendents may be appointed as guardians of the estates, or of the persons, of those committed to their charge or safekeeping; provided, the provisions of this Act [Okla.Stat.Ann. tit. 58, Secs. 773, 774] shall not prohibit the appointment of officers or managers of fraternal or benevolent orders or homes and church orphanages as to inmates of such institutions.
 A violation of the above statute is a misdemeanor. Okla.Stat.Ann. tit. 58, Sec. 774 (West 1965) (renumbered as tit. 30, Sec. 4-102 (West Supp.1990)).
 
 
 [8]
 Okla.Stat.Ann. tit. 10, Sec. 410 (West 1987), part of the Child Care Facilities Licensing Act provides:
 Any person or agent, representative, or officer of any child care facility who violates any of the provisions of this act shall, upon conviction, be deemed guilty of a misdemeanor and punished in accordance with the provisions of 21 O.S.1961, Sec. 10. Whenever any agent, representative, or officer of any child care facility shall be convicted under authority of this act, such conviction shall be sufficient ground for the revocation of the license of said licensee.
 
 
 [9]
 DHS policy concerning the preparation of a case for court provides:
 All observable information is recorded precisely and quantitatively. In recording evidence designate where, who, how long, what time, and how many. If impressions are recorded, they are designated as such and related to observed activities.
 DHS Child Welfare Services-Child Abuse/Preventive Services Procedures Secs. 623.6(D) (10/1/84), reproduced in rec. vol. III, doc. 114, ex. I. This procedure obviously was not followed concerning the allegations of child prostitution and pornography which form the basis of this case.
 
 
 [10]
 Judge Brown testified on deposition:
 Q: If Detective Einhorn [at the later hearing] had denied relating any allegations involving nefarious sexual activity like child prostitution, child pornography, or child trafficking while he was under oath, that would be in direct contradiction to what he told you wouldn't it?
 Judge Brown: That's correct.
 Rec. vol. III, doc. 114, ex. D1 at 46.
 
 
 [11]
 Defendant Levingston indicates that Mrs. Snell and other adults at the Snell home refused to cooperate in getting the children ready to leave and became somewhat abusive. Rec. vol. I, doc. 96, ex. 6 at 3. This is corroborated by Sergeant Johnson, who indicated that the situation deteriorated as the children were removed. Id. at ex. 7 at 5
 
 
 [12]
 Under the title of "Due Process Procedures," the DHS manual provides:
 A. Right to Be Informed of Allegation. Parents must receive a clear, precise explanation of allegations that have been presented. The explanation of allegations must occur immediately upon initial contact with the parent(s)/guardian. The worker also advises them of the agency's role in relation to the allegation, and of the statutes that exist to protect children in Oklahoma.
 DHS Child Welfare Services-Child Abuse/Preventive Services Procedures Sec. 623.7(A) (10/1/84), reproduced in rec. vol. III, doc. 114, ex. I.
 
 
 [13]
 The federal district court appears not to have considered this evidence linking Asbury to the ultimate issuance of the order
 
 
 [14]
 These immunities were present in 1871 when Sec. 1983 was enacted as Sec. 1 of the Ku Klux Klan Act, 17 Stat. 13
 
 
 [15]
 As we understand this case, DHS seems to have been investigating allegations that the children in the Snells' care were "deprived children" within the meaning of Okla.Stat.Ann. tit. 10, Sec. 1101(4) (West Supp.1990). A deprived child includes "a child who does not have the proper parental care or guardianship or whose home is an unfit place for the child by reason of neglect, cruelty or depravity on the part of his parents, legal guardian, or other person in whose care the child may be...." Id.; see also DHS Child Welfare Services-Child Abuse/Preventive Services Procedures Sec. 623.5(B)(2) (10/1/84), reproduced in rec. vol. III, doc. 114, ex. I. A dependent and neglected child is a deprived child. Okla.Stat.Ann. tit. 10, Sec. 1101(4) (West 1990)
 
 
 [16]
 See DHS Child Welfare Services-Child Abuse/Preventive Services Procedures Sec. 622.2 (district attorney may make determination as to need for further investigation or prosecution based on findings of DHS), Sec. 622.31 (contact local law enforcement authorities if immediate attention required), Sec. 622.4 (same), Sec. 622.4(B) (if cannot complete report due to lack of cooperation, contact law enforcement or complete report with information obtained), Sec. 622.41(B) (DHS investigation is an "official inquiry," not a police investigation); Sec. 622.43 (report of investigation sent to district attorney with recommendation); Sec. 623.3 (emergency placement and shelter care requests presented through district attorney or Juvenile Bureau; only when these sources cannot be reached may DHS worker contact district judge directly; peace officer or court employee is empowered to take child into immediate protective custody, if necessary), Sec. 623.4 (district attorney has discretion whether to file petition or pursue criminal charges), Sec. 623.7(D) (same), Sec. 624.11 (generally district attorney will decide whether there is sufficient evidence to proceed with a petition; district attorney or Juvenile Bureau prepares all pleadings and DHS workers do not sign petitions except in unusual or emergency situations with prior approval) (10/1/84), reproduced in rec. vol. III, doc. 114, ex. I
 
 
 [17]
 It seems strange indeed for the DHS to have obtained an order authorizing detention of only those children for which the Snells lacked court custody documents, given purported allegations of child prostitution and pornography. If any foundation existed for such allegations, one would expect all of the children at the Snells to be in jeopardy. The order that was issued was consistent with the licensing investigation
 
 
 [18]
 We recognize that this circuit has granted absolute immunity to probation officers who allegedly made false statements in a pretrial bond report and a presentence report. Tripati v. United States INS, 784 F.2d 345, 347-48 (10th Cir.1986) (per curiam), cert. denied, 484 U.S. 1028, 108 S.Ct. 755, 98 L.Ed.2d 767 (1988). And some courts have reached results in which both social workers involved in child protection and probation officers were accorded the same type of immunity, whether it be absolute or qualified. Hodorowski, 844 F.2d at 1214 (qualified immunity); Austin, 830 F.2d at 1361 (qualified immunity); Meyers, 812 F.2d at 1159 (absolute immunity); Myers v. Morris, 810 F.2d 1437, 1466-67 (8th Cir.), cert. denied, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987) (absolute immunity; private social worker). Our decision in Tripati is in no way inconsistent with the result reached here
 Absolute immunity for the probation officer in Tripati extended to the preparation of the pretrial bond or presentence report, not to every activity that a probation officer may undertake. 784 F.2d at 348. Tripati is in keeping with a functional approach to absolute immunity because the court requires pretrial bond and presentence reports in handling the criminal docket. Id. These functions of the probation officer are integrally related to the judicial function.
 The cases relied upon in Tripati do not purport to establish a broader rule or suggest a different rule in this case. Hughes v. Chesser, 731 F.2d 1489, 1490 (11th Cir.1984) (absolute immunity for preparation and submission of presentence report); Spaulding v. Nielsen, 599 F.2d 728, 729 & 729 n. 2 (5th Cir.1979) (same); Burkes v. Callion, 433 F.2d 318, 319 (9th Cir.1970), cert. denied, 403 U.S. 908, 91 S.Ct. 2217, 29 L.Ed.2d 685 (1971) (absolute immunity for probation officer preparing and submitting a probation report in a criminal case); see also Demoran v. Witt, 781 F.2d 155, 158 (9th Cir.1985) (absolute immunity for preparation of presentence report). In contrast to the preparation of pretrial bond or presentence reports, other decisions involving the revocation of probation or parole by a probation or parole officer warrant only qualified, not absolute, immunity because such decisions are farther removed from the judicial process and are not initiated by courts. Griffin v. Leonard, 821 F.2d 1124, 1125 (5th Cir.1987); Nelson v. Balazic, 802 F.2d 1077, 1078-79 (8th Cir.1986); Ray v. Pickett, 734 F.2d 370, 374 (8th Cir.1984); Galvan v. Garmon, 710 F.2d 214, 215 (5th Cir.1983), cert. denied, 466 U.S. 949, 104 S.Ct. 2150, 80 L.Ed.2d 536 (1984). It is these latter cases that the courts in Hodorowski and Austin relied upon in determining that social workers involved in child protection were not entitled to absolute immunity. We also find these latter cases analogous to the situation presented in this case.
 
 
 [19]
 For two reasons, defendant Padley is not entitled to absolute quasi-judicial immunity on a theory that she merely acted at the direction of Judge Brown in preparing the application. First, there is no evidence that Judge Brown ordered Padley to file the application containing the false allegations. See Turney v. O'Toole, 898 F.2d 1470, 1472-73 (10th Cir.1990) (absolute quasi-judicial immunity applied to execution of judicial order of confinement); Valdez v. City & County of Denver, 878 F.2d 1285, 1288 (10th Cir.1989) (officers arresting and confining plaintiff on judge's contempt order entitled to absolute quasi-judicial immunity). Second, defendant Padley's conduct involved more than a ministerial act pursuant to a judge's directive, see Valdez, 878 F.2d at 1289, rather her decision to prepare and file the application was a product of legal judgment
 
 
 [20]
 Padley indicated that she did not know whether the allegations concerning the Snells contained in the application were true or false; the purpose of the investigation was to so determine. Rec. vol. III, doc. 114, ex. C at 273-74. Padley might have disclosed that the Snells were in no way sought as suspects by the F.B.I. Rule 3.3 of the Oklahoma Rules of Professional Conduct prohibits a lawyer from knowingly making "a false statement of fact or law to a tribunal." Okla.Stat.Ann. tit. 5, ch. 1, app. 3-A (West Supp.1990). Rule 3.3(d), now in effect, requires that a lawyer in an ex parte proceeding inform the court of all material facts necessary to make an informed decision, "whether or not the facts are adverse." Id
 
 
 [21]
 If the plaintiff is unable to marshal evidence indicating that the conduct complained of violated the law as presently interpreted, it is unnecessary to consider whether the law was clearly established at the time such conduct occurred. McEvoy v. Shoemaker, 882 F.2d 463, 465 (10th Cir.1989)
 
 
 [22]
 Padley responded on deposition as follows:
 Mr. Sherwood: At this point, then, when you filed this pleading, your testimony will be when this case goes to trial that you did not have any idea whether those allegations were true or false?
 Ms. Padley: That's correct.
 Mr. Sherwood: You did not--then you would agree with me that, at that point, you had no reasonable basis to assume that these allegations were true?
 Ms. Padley: We had no way to know.
 Mr. Sherwood: You had no reasonable basis to know whether the allegations were true?
 Ms. Padley: That's what the investigation would reveal, hopefully.
 Rec. vol. III, doc. 114, ex. C at 273.